Filed 6/30/22

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>ALVIN VILLETE CAPARAZ,<br><br>    Defendant and Appellant. | A158473<br><br>(Napa County<br>Super. Ct. No. CR175531) |

Defendant Alvin Villete Caparaz was convicted of multiple counts of lewd acts upon a child under the age of 14 and additional sexual offenses. The two victims, Jane Doe 1 and Jane Doe 2, were his girlfriend's nieces. The trial court sentenced defendant to 90 years to life in prison.

Prior to the criminal jury trial, there was a trial on competency, and a jury found defendant competent. On appeal, defendant claims error in both the competency trial and the criminal trial.

As to the competency trial, defendant contends the trial court erred in allowing the jury to hear improper hearsay in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) and *People v. Campos* (1995) 32 Cal.App.4th 304 (*Campos*).

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts A., C., D., and E.1. of the Discussion.

1

In the criminal trial, the trial court allowed the defense to present a psychologist as an expert on false confessions and suggestibility. But the court only allowed the psychologist to give general testimony and did not permit the expert to offer his assessment of defendant's particular suggestibility and susceptibility to give a false confession, nor was the expert permitted to testify about the results of psychological tests he administered to defendant, including the Gudjonsson's Suggestibility Scales. Defendant claims the exclusion of this defendant-specific expert testimony was an abuse of discretion. Defendant also argues that defense counsel was ineffective in failing to object to improper questioning of the mother of one of the victims, that the sentence imposed constitutes cruel and unusual punishment, and that the matter should be remanded for resentencing in light of a recent amendment to Penal Code section 654.

In the published portion of this opinion, we agree with defendant that the trial court abused its discretion in excluding the expert's defendant-specific testimony, but we find the error harmless, and we conclude that remand for resentencing is not necessary. In the unpublished portion of this opinion, we address defendant's remaining claims and find no error. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Background*

Defendant was born in the Philippines, and he and his family moved to the United States in 1987 when he was 14 years old. Defendant lived in his parents' house with his longtime girlfriend and their son.

Defendant's girlfriend, S., was close with her sisters, K. and D., both of whom have children. The three sisters and their families (partners and

2

children) often spent time together on the weekends. Jane Doe 1 is K.'s daughter, and Jane Doe 2 is D.'s daughter.

The offenses came to light in April 2015, after the principal of Doe 2's elementary school learned that Doe 2 told a school friend she had been abused. The principal met with Doe 2, who told the principal that her "Uncle Alvin" had touched her private parts when she was around six or seven years old. Doe 2 said she would go to her aunt and uncle's house on the weekends in Vallejo, and the abuse happened there. After speaking with Doe 2, the principal filed a report with Child Protective Services identifying the suspected abuser as "Uncle Alvin Caparaz." Soon after, Doe 1 and Doe 2 separately told their mothers that defendant had abused each of them.

In May 2015, defendant was arrested and held to answer for child molestation and related offenses. A jury trial was set to start on June 26, 2017. On June 21, 2017, defense counsel declared a doubt about defendant's competence. In August 2018, a jury found defendant competent to stand trial.

In a first amended information, the Napa County District Attorney charged defendant with six counts: forcible lewd acts upon Doe 1, a child under the age of 14 years (Pen. Code,[1] § 288, subd. (b)(1); counts 1 and 2), aggravated sexual assault of Doe 1, a child under 14 (§ 269, subd. (a)(5); count 3), sexual penetration by foreign object of Doe 1, a child under 14 (§ 289, subd. (a)(1)(B); count 4), and lewd acts upon Doe 2, a child under 14 (§ 288, subd. (a); counts 5 and 6). As to counts 1, 2, 4, 5, and 6, it was alleged

---

[1] Further undesignated statutory references are to the Penal Code.

that defendant committed the offense against more than one victim. (§667.61, subds. (j)(2) and (e)(4).)[2]

A jury trial began in July 2019. The jury found defendant guilty of all charges and found all special allegations true.

*The Prosecution's Case*

<u>Jane Doe 1</u>

Doe 1 was 19 years old at the time of trial. The first incident she recalled occurred at a family celebration at defendant's house when she was 11 years old. Defendant carried her down the stairs, and Doe 1 "felt fingers feeling up [her] shorts, around [her] butt area." During the same visit, Doe 1 was playing hide and seek, and defendant told her he knew a good hiding spot. He led her to a dark room she hadn't been in before, and he said he would give her a massage. Defendant started massaging her back and then touched her breasts and butt, first over her clothes and then under her clothes, touching her skin.

In one of the "worst times" Doe 1 recalled, defendant went into her room, started groping her, and then unfastened his belt. Defendant grabbed Doe 1's wrist, moved her hand to his penis, and told her to touch it. He told Doe 1 to squeeze his penis. She tried to pull away, but he had a "strong grip" and kept her hand there. Defendant's penis was hard, and he started jerking her hand around. He ejaculated on the floor and rubbed the semen into the carpet with his foot. During the same incident, defendant sucked on her breasts and touched her butt. Doe 1 was 12 or 13 when this happened. Doe 1

---

[2] Section 667.61 is the "One Strike" law, "which provides an alternative, more severe set of penalties for certain sex offenses committed under certain enumerated circumstances." (*People v. Anderson* (2020) 9 Cal.5th 946, 954.) It was further alleged as to counts 1 and 2 that defendant had "substantial sexual conduct" with the victim. (§ 1203.066, subd. (a)(8).)

4

estimated that defendant made her touch his penis on three different occasions.

In another incident when she was 11 or 12, Doe 1 walked from her house to the family's parked car to unload groceries. She was by herself, and defendant followed her; he "came really close and put his . . . finger in [her] vagina." She was wearing shorts, and he moved his hand up her leg and under her clothes. It was "[p]ainful, uncomfortable."

Another time, when Doe 1 was about 13, defendant went in her room and told her he would give her money if she did what he asked. He gave her perhaps $10 in dollar bills and groped her breasts and butt and sucked on her breasts. Doe 1 estimated defendant offered her money around four times.

The last incident Doe 1 remembered occurred when she was almost 14 years old. Defendant went into her room, and she threatened him with a pocketknife. They "stared at each other for a second and then he left."

Defendant told Doe 1 not to tell her parents and "keep it a secret," but she could not recall when he said that. When she was 13, Doe 1 told her friend by text that she was sexually assaulted by her uncle.[3]

K. (Doe 1's mother) testified that when Doe 1 was around 11 or 12, she became "always sad, always mad." One time, when S., defendant and their son visited K.'s house, K. found Doe 1 hiding in a walk-in closet. D. (Doe 1's aunt) testified about a family trip to Disneyland. Defendant wanted Doe 1 to stay at his family's place, and Doe 1 "started crying, saying, I don't want to go, I don't want to go, I want to stay with you, Auntie."

---

[3] The friend testified at trial that Doe 1 told her something about her uncle when they were in eighth or ninth grade. The friend testified that Doe 1 texted her "that he made her uncomfortable." Doe 1 told the friend that when defendant was around, "she would try to lock herself in her room to be away from him."

5

<u>Jane Doe 2</u>

Doe 2 was 15 years old at the time of trial. When she was seven and eight years old, defendant would sometimes watch Doe 2, her brother, and his own son.

Doe 2 testified the first incident occurred when she was seven and a half. Defendant drove her, her brother, and defendant's son to a playground to play. Defendant was sitting in the driver's seat of his car, and he told Doe 2 to sit next to him. Defendant "started caressing [her] bottom." He rubbed under her clothes, touching her skin.

In another incident when she was eight, Doe 2 and her brother were at defendant's house for a sleepover. Defendant took her to a walk-in closet and closed the door. He rubbed her butt and "humped" her, "rubbing his genitals on [her] behind." Another time, Doe 2 was again with defendant, her brother, and his son at the playground. Doe 2 was in the car with defendant, and he touched her butt and sucked her breast. A fourth incident occurred in a parking lot. Doe 2 was in the front seat with defendant, and he started "squeezing [her] butt over [her] clothes."

In fourth grade, Doe 2 had a sex education class and realized what defendant had done was wrong. Doe 2 told her best friend about defendant.[4]

<u>Pretext Telephone Call</u>

On May 7, 2015, Doe 1 and her mother met with Napa County Deputy Sheriff Nathalie Hurtado, and Hurtado had Doe 1 make a pretext phone call to defendant. A recording of the call was played for the jury.

---

[4] Doe 2's friend testified Doe 2 told her that "[h]er mom's brother" raped her; Doe 2 did not say the uncle's name. (Doe 2 testified that about a week after telling her friend about the abuse, the principal at her school met with Doe 2 and asked her about it.)

At the start of the call, Doe 1 told defendant she wanted to tell her mom about when "you were touching me and stuff" but said she did not want the police involved. Defendant responded, "No, no, no, no, just don't, please—please don't . . . ." Doe 1 said she wanted to get over what happened, and defendant promised he would not do it again. Doe 1 asked if he could apologize to her. Defendant said he was "really sorry," and he was "not in my mind." Doe 1 asked why he did it, and defendant responded, " . . . I don't know what . . . just desperate or something." Defendant again asked Doe 1 not to tell "because they're going to call the police on me," and said he was really sorry "[f]rom the bottom of my heart." Asked why he touched her breasts and butt, defendant said, "[Doe 1], don't . . . I just can't help myself, I don't know why. I really regret this, you know, [Doe 1]." Doe 1 asked why defendant made her touch him. Defendant answered, "I don't know, I'm not just thinking . . . I'm really sorry, [Doe 1], huh, so please don't tell your mom . . . ." Defendant told her, "I just . . . started to like you or something, . . . like a crush," "[y]ou really makes [*sic*] . . .it's like your, ya . . . it's kind of a crush on you. That's what it is." Doe 1 asked why he made her touch his penis and why he sucked on her breast, and defendant responded that he was not thinking and asked Doe 1 to forgive him. She asked if he liked young girls, and defendant said, "I think so, ya." She asked him to "[s]ay what you did to me." Defendant said, "touching you" "[y]our boobs," "butt."

Defendant's Statements to Law Enforcement

After the pretext call, Detective Hurtado arrested defendant at his workplace in San Francisco; she told defendant she wanted to speak to him about his nieces. Defendant gave recorded statements, first, during the drive from San Francisco to Napa and, again, at the Napa Sheriff's Department.

7

*Car Ride*

On the drive to the Napa Sheriff's Department, Hurtado advised defendant of his *Miranda* rights,[5] and he said he understood. An audio recording of the conversation was played for the jury.

During the car ride, Hurtado asked whether defendant knew which niece she wanted to talk about, and he identified Doe 1. She told him she had talked to Doe 1 "about some stuff" and wanted to hear defendant's side about what happened. Defendant said, "I don't even know why I did that to her." Hurtado said she also talked to Doe 2 and asked what happened with her. Defendant responded, "I just—somehow I just kiss her or something." He admitted that he felt her butt and kissed her breasts. Defendant said his mother knew "the cops [were] looking for [him]," and he had told her, "That I made a big mistake."

According to Hurtado, defendant was crying off and on and he had his head down for most of the conversation in the car.

*Interrogation*

At the Napa Sheriff's Department, Hurtado spoke with defendant in an interrogation room for about an hour. A videorecording of the interview was played for the jury.

Hurtado asked about the first time anything happened with Doe 1. Defendant believed it was in his house. He said it happened last year. He said they were "just playing around" "with the kids" "Then suddenly just (unintelligible)." Defendant admitted he touched her breasts and said it was over her clothes. He agreed that he touched Doe 1's breasts and butt under her clothes, sucked on her breasts, and made her put her hands on his penis.

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436, 444.

Hurtado said Doe 1 told her sometimes defendant "saw her for money," and asked if he remembered that. Defendant responded, "I gave her money." He said he did it "[s]o she wouldn't tell," but he was not sure how much money he gave her. Hurtado asked if he looked at pictures of young girls online, and defendant said he watched "pornos and stuff" on his iPad.[6] Hurtado said it "makes sense, why that would happen, if you had a crush on her," and defendant said, "It's not right, though." Later in the interview, defendant said, "I'm just very attracted to her," referring to Doe 1. Defendant admitted he made Doe 1 touch his penis and he ejaculated. He said this happened "[t]hree times" and he regretted it. Defendant also admitted that he put his hand up her shorts and touched her vagina one time when Doe 1 was getting groceries out of the car. Asked if he touched inside her vagina, defendant responded, "I believe so," and said he used his fingers.

Regarding Doe 2, defendant confirmed that he used to take her, her brother, and his son to the park, and he would stay in the car with her. Hurtado asked what happened in the car, and he answered, "I would touch her boobs." He denied touching her butt, but said he sucked her breast "[o]ne time." Defendant then admitted he touched her butt under her clothes and said it happened "twice only." Defendant denied touching her vagina.

In addition, defendant admitted that something happened with his own cousins "a long time ago." This was in response to Hurtado's question whether there were "other girls that this happened to." Defendant responded, "My cousin," M. He said M. was 12 years old when things

---

[6] Asked about the pornography he watched, defendant said it was "kissing and touching," and he denied that the girls depicted were under 18 years old. Defense counsel elicited testimony from Hurtado that she later obtained defendant's iPad from S., the iPad was searched, and "no illegal content" was found.

happened. He admitted he touched her breasts and butt, sucked her breasts, and made her touch his penis. Defendant said he also touched M.'s sister, J. He admitted he touched her breasts and butt and made her touch his penis. But when asked, "Did you touch her vagina? Did you suck on her boobs?" defendant responded, "No, nothing."

*Defense*

The defense aimed to call into doubt both the victims' accounts of abuse and identification of their abuser and defendant's admissions to Doe 1 and Hurtado. The defense sought to portray defendant as a simple, docile, and compliant person who could be manipulated to admit to things he did not do. Defense counsel suggested the victims may have been abused by their uncle Dennis (the brother of S., D., and K.) and implied that D. and K. may have wanted to blame defendant to protect their brother.[7] The defense called four witnesses: two of defendant's relatives and two expert psychologists.

Defendant's cousin J. (born in 1984) testified that when she was growing up, defendant and his family lived in a separate unit in the same building with her family and that defendant never did anything inappropriate with her. She denied there was ever any touching, "affectionate or anything," between defendant and herself.[8] In cross-

---

[7] Defense counsel elicited testimony from K. that she became estranged from her brother Dennis around the time the offenses were discovered. It was also established that Dennis lived in Vallejo. Defense counsel argued this was significant because Doe 2's school principal testified that Doe 2 said the abuse happened in Vallejo.

[8] Hurtado testified that she tried to contact defendant's cousins M. and J. during her investigation. She made an appointment to meet with M., but M. later left a message that she did not want to participate in any kind of investigation. Hurtado did not pursue the matter further because she

examination, J. said defendant was a popular guy who DJ'd parties and had a lot of friends.

Defendant's younger brother Anthony Caparaz established that defendant, the oldest of five siblings, always lived with his parents. Defendant graduated from high school and had jobs as a security guard and a parking attendant. He spoke Tagalog at home with his parents and "Taglish," meaning "Tagalog/English," with S.[9] Anthony testified that defendant is sometimes "easy to convince about silly things" and he is "a relatively simple guy, the interest is the family and helping the family."

The defense called forensic psychologist Joanna Edwards as an expert on memory processes and suggestibility in adults and children. She testified that memory is malleable and "constantly changing and evolving based on outside information that may come after the fact." Children "can be more suggestible" compared to adults, and suggestive questioning can influence a child's memory. Edwards testified that informal conversations with parents, who are not trained in proper interviewing protocols, can introduce memory suggestibility issues. She explained there are risks in interviewing people multiple times on the same subject; if one is asked a question and then asked the same question again and again, the person "may come to the conclusion that the answer that I provided the first time was not okay. And so I need to answer differently."[10] Further, positive and negative reinforcement can

"wasn't about to force somebody into making a disclosure if they weren't ready." Hurtado left a message for J., but she never responded.

[9] Defendant had a Tagalog interpreter at trial.

[10] In this vein, defense counsel elicited testimony that Doe 2 spoke with at least two people (her school principal and her mother) about being molested before Hurtado interviewed her and that Doe 1 spoke with her mother and two police officers before Hurtado interviewed her.

influence reports made by children, and studies have shown "people can create entirely false memories, even ones that can be particularly traumatic."

Psychologist Ricardo Winkel testified as an expert in "suggestibility within the context of false confessions." He testified that research has shown people "confess to things they didn't do, including terrible crimes." Factors or variables that may make a person more susceptible to giving a false confession include low education level, having cognitive deficits, being interrogated in a non-native language, having a passive, compliant, or dependent personality, and lacking experience with law enforcement.[11] Winkel explained, "Each of these variables separately could contribute to making a person susceptible. The more variables you have, the higher the likelihood the person would [falsely confess]. Sometimes it increases geometrically or exponentially." Emotional state, such as being anxious or depressed, is another factor. Winkel testified that a skillful investigator may obtain a false confession "without any undue coercion [or] anything untoward" and that "there are cases where people [falsely] confess not because . . . of the actions of the investigator, but because of something in them." In cross-examination, Winkel testified that suspects confess for a variety of reasons, "[i]ncluding guilt," and he agreed that suggestible people can give true statements. As we will discuss, Winkel met with defendant in jail and conducted a psychological assessment to determine whether defendant was especially susceptible to giving a false confession, but the trial court did not permit Winkel to testify about the psychological testing he

---

[11] Defense counsel elicited testimony from Hurtado that defendant was "especially docile" and "especially compliant" during the interrogation. She also testified that defendant had no criminal history or prior police contacts.

conducted or offer his opinion about defendant's susceptibility to falsely confess.

In closing argument, defense counsel emphasized testimony from Doe 2's friend that Doe 2 said her "mom's brother" molested her and pointed out that D.'s brother was Dennis, not defendant. Defense counsel suggested Doe 2 "might be susceptible to altering her story if asked to do so by her mother" and said, "What if she was asked to change from Dennis to Alvin?" He argued multiple interviews risked altering the victims' memories and asserted that children, in general, are "not [the] most trustworthy historians." Citing expert Winkel's testimony, defense counsel argued all the variables that can make a person more susceptible to giving a false confession were present in defendant's case, and he noted that defendant "purportedly confess[ed]" to molesting J. even though J. testified it never happened.

## DISCUSSION

A.     *Claim of* Sanchez/Campos *Error at the Competency Trial*

Defendant contends the prosecutor's cross-examination of the defense expert and the testimony of a prosecution witness at his competency trial introduced improper hearsay evidence in violation of *Sanchez*, *supra*, 63 Cal.4th 665, and *Campos*, *supra*, 32 Cal.App.4th 304. We find no error and, in any event, find no prejudice.

We begin with a brief primer on *Sanchez* and *Campos* and then describe the competency trial and testimony and questioning at issue.

1.     <u>*Sanchez* and *Campos*</u>

While lay witnesses may testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), "experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures,

13

study of learned treatises, etc." (*Sanchez*, *supra*, 63 Cal.4th at p. 675.) "The hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Id.* at p. 676.)

In *Sanchez*, the California Supreme Court distinguished general knowledge from *case-specific facts* and clarified that "an expert *cannot . . .* relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Sanchez*, *supra*, 63 Cal.4th at p. 686.)

In addition, long before *Sanchez* was decided, the Court of Appeal in *Campos* recognized, "An expert witness may not, on direct examination, reveal the content of reports prepared or opinions expressed by non-testifying experts." (*Campos*, *supra*, 32 Cal.App.4th at p. 308.) More recently, Division Four of our court restated the *Campos* rule: "An absent witness's opinion may not be smuggled into evidence through an expert by dressing it up as background information." (*Strobel v. Johnson & Johnson* (2021) 70 Cal.App.5th 796, 822.)

2. Background

In June 2017, after defense counsel declared a doubt about defendant's competence, the trial court suspended the criminal proceedings and appointed psychologist Richard Geisler and psychiatrist Gregory Sokolov to assess defendant's competence to stand trial pursuant to section 1368. In July 2017, both court-appointed experts submitted assessment reports to the court with their conclusions that defendant was competent to stand trial.

14

Defense counsel then requested that the director of the regional center assess defendant, and the court ordered that defendant be referred to the Golden Gate Regional Center (GGRC).[12]

In April 2018, GGRC submitted a letter to the court stating that it had determined defendant did "not have a developmental disability as defined in § 4523 [*sic*[13]] of the California Welfare and Institution Code" and, therefore, defendant was "not eligible for services with Golden Gate Regional Center."

---

[12] Regional centers are private non-profit corporations that contract with the Department of Developmental Services to "assist persons with developmental disabilities and their families in securing those services and supports which maximize opportunities and choices for living, working, learning, and recreating in the community." (Welf. & Inst. Code, § 4640.7, subd. (a); *Tri-Counties Association for Developmentally Disabled, Inc. v. Ventura County Public Guardian* (2021) 63 Cal.App.5th 1129, 1137.)

In a trial on the question of a criminal defendant's mental competence, "[i]f it is suspected the defendant has a developmental disability, the court shall appoint the director of the regional center . . ., or the director's designee, to examine the defendant to determine whether he or she has a developmental disability. The regional center director or his or her designee shall determine whether the defendant has a developmental disability, as defined in Section 4512 of the Welfare and Institutions Code, and is therefore eligible for regional center services and supports. The regional center director or his or her designee shall provide the court with a written report informing the court of this determination." (§ 1369, subd. (a)(3).)

[13] Welfare and Institutions Code section 4512 (not 4523) defines "[d]evelopmental disability" as "a disability that originates before an individual attains 18 years of age, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual. As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include intellectual disability, cerebral palsy, epilepsy, and autism. This term shall also include disabling conditions found to be closely related to intellectual disability or to require treatment similar to that required for individuals with an intellectual disability, but shall not include other handicapping conditions that are solely physical in nature." (Welf. & Inst. Code, § 4512, subd. (a)(1).)

The letter was signed by Nori Kitaoka, a GGRC forensic social worker. She wrote that, due to defendant's ineligibility for services, GGRC was "unable to [prepare a section] 1369 report or comment concerning Mr. Caparaz's competency to stand trial."

In August 2018, a jury trial was held to determine whether defendant was competent to stand trial. A criminal defendant is presumed to be competent, and it was defendant's burden at trial to prove by a preponderance of the evidence that he was mentally incompetent.[14] (§ 1369, subd. (f); *People v. Buenrostro* (2018) 6 Cal.5th 367, 387.)

### Dr. Shields's Testimony

The defense called psychologist Dr. John Shields as an expert in competency and forensic psychology. He opined that defendant was incompetent to stand trial. Shields testified he met with defendant four times using a Tagalog interpreter. He also reviewed defendant's social history, medical history, police reports, interviews, and previous psychological reports.

Shields gave defendant a test called the MacArthur Competence Assessment Tool Criminal Adjudication, which Shields testified was a "standardized way . . . to collect information" in contrast to the "very typical methodology" other evaluators use of asking a defendant to identify "the different people that are involved in court and what their job is," which Shields opined is a "more subjective" and less useful assessment method.

---

[14] "A defendant is mentally incompetent . . . if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

16

Shields believed that to be competent to stand trial a criminal defendant must "be able to reason, to use the information they know in order to make other types of decisions," and he found deficits in defendant's legal reasoning. He acknowledged that defendant was "pretty good at" "identifying the roles of the various players" in the courtroom, but he found defendant was "intellectually deficient" and concluded defendant would have problems in "his ability to plan a legal strategy or to be engaged in his defense or maybe even to assist in challenging witnesses. . . ."

Shields diagnosed defendant with an unspecified neurocognitive disorder. He gave defendant an intelligence test and determined his IQ was "just a tick above" 70. Shields explained that this placed defendant in the "borderline range of intellectual impairment. If he was in the impaired range of intellectual impairment he would have IQ scores at or below 70 points, which would meet one of the criteria for intellectual disability or what we used to call mental retardation." Shields testified that defendant was *not* sufficiently intellectually impaired "to be referred to as . . . intellectually disabled" but "he's really close."

On cross-examination, Shields acknowledged that when he met with defendant, defendant was "very cooperative" and gave appropriate answers to questions. Defendant understood the purpose of their meetings, and "he knew I was there at his attorney's request to evaluate him." Shields agreed that nothing in defendant's high school or other records indicated he had been evaluated for learning disabilities while in school. Shields further acknowledged that defendant was not a client of a regional center.

Without objection, the prosecutor elicited Shields's testimony that he was aware defendant had some contact with the regional center and his understanding was that the regional center determined defendant was not

17

eligible for its services. Shields explained that regional centers typically "go through a series of steps and in some cases individuals can be disqualified for eligibility before they're actually seen by a psychologist who administers standardized testing to assess their intellectual ability." He did not know what was done in defendant's case.

The prosecutor then asked, "[I]f you were told or if you learned that they [the regional center] had in fact conducted cognitive testing and psychological testing and taken all the steps and then determined him ineligible for Regional Center services, would that change your opinion in any way?"

Shields responded, "No, not at all. . . . [T]he Regional Center typically uses fairly discrete criteria and cutoffs for people that they consider to be eligible for their services. [¶] In my experience when somebody is referred to them with a possible intellectual developmental disability, the assessment that's conducted is really targeted to discerning whether or not the person meets the diagnostic criteria for intellect disability, like mental retardation. And I'm not surprised that in this case they would reach that conclusion . . . ." He offered two reasons the regional center may have found defendant ineligible. First, the diagnosis of intellectual disability must be established before age 18, which would be difficult to establish when evaluating defendant, who was 45 years old at the time of the competency trial. Second, defendant's IQ (according to Shields's testing) was "just a tip above that line" to qualify as intellectually disabled. Shields testified, "while he might not qualify for Regional Center services, [he is still] . . . vulnerable to not be able to fully comprehend the nature of these proceedings or adequately assist his legal counsel."

*Motion for Mistrial and Objection to Kitaoka's Testimony*

Cross-examination of defense expert Shields continued without objection. After a lunch break, however, defense counsel made an oral motion for a mistrial on the ground the questions regarding the regional center "put before the jury . . . the cognitive testing done by GGRC, which is far beyond the scope of the letter," referring to GGRC's April 2018 letter to the court, which stated defendant was ineligible for services and therefore GGRC could not comment on whether he was competent.

Defense counsel also objected to allowing Nori Kitaoka to testify about the GGRC letter.[15] He argued, "The whole letter is without foundation and violates *Sanchez*."

The prosecutor responded that Kitaoka "has been the forensic social worker from the inception of this GGRC case" and she would testify "that the GGRC opened an assessment case, some cognitive testing took place, they met with family, and had X, Y, Z meetings, interviewed Mr. Caparaz and at the culmination of all that they determined he's not eligible for GGRC services."

The trial court confirmed with the prosecutor that Kitaoka was part of the team at the regional center who determined whether defendant was eligible for services. The court asked whether any of the evaluators (Geisler, Sokolov, Shields) had relied on the GGRC letter and confirmed that they had not (as the letter postdated the evaluations). The court then denied the

---

[15] The prosecution's trial brief listed Kitaoka as a witness. Other prosecution witnesses included Drs. Geisler and Sokolov.

19

motion for mistrial, finding no *Sanchez* error, and permitted Kitaoka to testify.[16]

### *Kitaoka's Testimony*

Kitaoka testified about what regional centers do and who qualifies for services (generally, persons with developmental disabilities). (See fns. 12 and 13, above.) Kitaoka was the assessment social worker in defendant's eligibility case. In August 2017, the trial court requested GGRC prepare a section 1369 report for defendant. Initially, GGRC "decided that there was not enough evidence of suspicion of a developmental disability to open the case," and Kitaoka reported this determination to the court. Subsequently, defense counsel submitted additional information, and GGRC decided there was enough information to open an eligibility case.

Kitaoka testified that because GGRC only evaluates mental competency for individuals who qualify for regional center services, GGRC first had to determine whether defendant was eligible for services before it could conduct a mental competency evaluation. She described the steps for defendant's eligibility assessment: defendant met with Kitaoka for a social assessment; GGRC gathered available educational and medical records; cognitive testing was done; and a meeting was held with defendant's family.[17]

Kitaoka testified the final step in an eligibility determination case is a case conference of the interdisciplinary team composed of the assessment

---

[16] The next day, defense counsel filed a motion for reconsideration of his request to exclude Kitaoka and a renewed motion for mistrial. After hearing further argument from counsel, the trial court denied the motions.

[17] For her social assessment, Kitaoka met defendant at the jail with a Tagalog interpreter and asked him about his early development and adaptive functioning. She testified his answers were rational and logical and assisted in her assessment. Kitaoka also attended the family meeting.

social worker (Kitaoka in defendant's case), the psychologist (who would discuss the results of cognitive testing), and the GGRC physician (who would discuss his or her review of the available medical records). Kitaoka testified that, in defendant's eligibility case conference, it was determined that he was not eligible for regional center services. Therefore, the threshold was not met for GGRC to conduct a mental competency evaluation.

On cross-examination, Kitaoka repeated that GGRC did not conduct a competency evaluation of defendant. She agreed that a person with significant intellectual disabilities would not be eligible for regional center services if it could not be established that the person had the disabilities before age 18.

3.    Analysis

On appeal, defendant does not claim it was error to allow the jury to learn that GGRC determined he was ineligible for regional center services. Rather, defendant claims Kitaoka's testimony violated *Sanchez* because she effectively conveyed to the jury the expert opinions of the non-testifying members of the interdisciplinary team that decided defendant was ineligible for regional center services. In particular, defendant argues Kitaoka conveyed information regarding GGRC psychologist Dr. Moore's cognitive testing of defendant and his out-of-court communications about his findings and opinions.

We disagree with the premise of defendant's claim. Kitaoka did not testify as an expert witness, she testified as a lay witness. As the assessment social worker in defendant's eligibility case, she testified based on her own personal knowledge that GGRC took certain steps and then determined defendant was ineligible for services. She was at the meeting where the decision was made. Defendant asserts the prosecutor appeared to view

21

Kitaoka as an expert, but this is of no moment. Kitaoka was not proffered as an expert, the trial court did not designate Kitaoka as an expert, and "[i]t is the trial court that makes this determination" (*People v. Jablonski* (2006) 37 Cal.4th 774, 823).

In any event, Kitaoka did not "relate as true case-specific facts asserted in hearsay statements." (*Sanchez*, *supra*, 63 Cal.4th at p. 686.) She did not reveal the results of any cognitive testing by Dr. Moore or any of his opinions. Indeed, she did not say whether the interdisciplinary team's decision had been unanimous. Likewise, her testimony did not violate *Campos* because she did not "reveal the content of reports prepared or opinions expressed by non-testifying experts." (*Campos*, *supra*, 32 Cal.App.4th at p. 308.) Nothing substantive about the results of Dr. Moore's testing was conveyed to the jury through Kitaoka's testimony.

Defendant next argues the prosecutor's cross-examination of Shields violated *Sanchez* when he was asked whether his opinion about defendant's competence would change if he knew that the regional center had "conducted cognitive testing and psychological testing and taken all the steps and then determined [defendant] ineligible for Regional Center services." Again, we disagree with the premise of defendant's argument. The prosecutor's question did not convey the results of Dr. Moore's cognitive testing or his opinions. The assumed facts underlying the question (that GGRC conducted an eligibility assessment and then deemed defendant ineligible for services) were established by Kitaoka's admissible testimony based on personal knowledge.

Moreover, even assuming Kitaoka's testimony and/or the prosecutor's question to Shields did contain inadmissible hearsay about Dr. Moore's cognitive testing, the errors were harmless. As we have stated, defendant

22

does not claim it was error for the jury to learn he was ineligible for regional center services. Kitaoka testified that regional centers serve persons with developmental disabilities, and she described the steps GGRC took in determining defendant was ineligible for services. At most, the jury may have inferred from Kitaoka's testimony that GGRC's cognitive testing supported a conclusion that defendant was not developmentally disabled. But this potentially inferred fact comported with defense expert Shields's own testimony; he testified that cognitive testing showed defendant was in the "borderline range" of intellectual impairment and his IQ was slightly too high to classify him as intellectually disabled.

More to the point, the question before the jury was *not* whether defendant was developmentally disabled, it was whether defendant was competent to stand trial. Kitaoka testified that GGRC *did not conduct a competency evaluation of defendant*. On this record, it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the alleged errors. (See *People v. Duarte* (2000) 24 Cal.4th 603, 618–619 [applying *Watson* standard to state law error in admitting hearsay].)

Finally, because defendant's hearsay claim fails, his related due process claim also fails. (See *People v. Abilez* (2007) 41 Cal.4th 472, 503 ["Having found no state law error, we also reject defendant's federal constitutional claim"].)

B.  *Exclusion of Expert Testimony on Defendant's Susceptibility to Give a False Confession*

Defendant contends the trial court's exclusion of proffered testimony from defense expert Winkel regarding his assessment of defendant's suggestibility and susceptibility to give a false confession was an abuse of

discretion and violated his rights to due process and a fair trial. We conclude the trial court abused its discretion, but we find no prejudice.

1.    Background

Well before trial, defendant filed a motion in limine to allow expert witness Dr. Winkel to testify on "issues of suggestibility and Miranda comprehension of the defendant and false confessions." The motion included Winkel's report, which he prepared at defense counsel's request to evaluate whether defendant was "especially susceptible to giving a false confession."

Winkel met with defendant twice and administered psychological tests including the Gudjonsson's Suggestibility Scales (GSS). He reported that defendant's GSS scores "indicate that he is a highly suggestible individual, more so than 85% of comparable population samples. As is the case with all other tests he took, his limited English possibly contributed to his offering random, incorrect answers when he didn't understand questions or didn't recall an original story he was asked to remember." Winkel found defendant to be "a weak, passive individual, lacking assertiveness, with very poor social skills. . . . Cognitively, he is slow, appears easy to manipulate, and seems eager to avoid confrontations." Winkel opined that defendant was "highly susceptible to giving a false confession under the stress of a police interrogation." He also concluded that defendant was not able to understand and knowingly waive his *Miranda* rights.[18]

_____

[18] Defendant made a separate motion, not at issue here, to suppress his statements to Hurtado during the car ride and at the Sheriff's Department as involuntary and in violation of *Miranda*, and Winkel testified at a hearing on this motion. The trial court denied the motion to suppress, finding defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights and his statements were admissible. The court also found defendant is bilingual and speaks English.

24

Defendant sought to have Winkel testify about false confessions generally and about his specific findings regarding defendant including his GSS scores.

The trial court did not issue a definitive ruling pretrial but indicated it was inclined not to allow Winkel to testify under Evidence Code section 352 unless evidence was presented that defendant falsely confessed. After trial commenced, the court held a hearing under Evidence Code section 402 to determine whether Winkel would be permitted to testify. At the section 402 hearing, Winkel testified he had been admitted in California state courts as an expert in suggestibility and false confessions many times. He testified that the GSS is a peer-reviewed widely accepted test in his field and that he gave defendant the GSS and made specific findings that were stated in his report. Defense counsel argued there was now evidence defendant falsely confessed, because defendant's cousin J. had testified that defendant never touched her inappropriately and because the absence of illegal pornography on defendant's iPad showed that defendant "invented information" in his statements to Deputy Sheriff Hurtado.

After hearing counsels' arguments, the trial court ruled that it would allow Winkel to testify generally about false confessions "[p]ursuant to the line of cases like *Page*,"[19] but it would not permit testimony about defendant's GSS results under Evidence Code section 352.

_____

[19] In *People v. Page* (1991) 2 Cal.App.4th 161, the trial court allowed the defense to present an expert on "the general psychological factors which might lead to an unreliable confession," but the expert was not permitted to identify particular elements in the police interrogation of the defendant that indicated those psychological factors were present or to opine on the reliability of the defendant's confession. (*Id*. at pp. 180, 183.) The appellate court concluded this limitation on the defense expert's testimony did not

25

Explaining its reasoning, the court first referred to its earlier denial of defendant's suppression motion (see fn. 18), stating that it had already deemed both confessions (statements made during the car ride and at the Sheriff's Department) to be voluntary and, further, "I personally also deem the confessions, both confessions, to be reliable."

But the court recognized that voluntariness and reliability "are two separate issues" and observed, "[T]he case law seems to hold that reliability is a factual determination to be made by the fact-finder." The court noted that in this case, there was no improper questioning or coercive behavior during the police interviews.

The court then stated, "What we are left, I think, is the issue whether he has any mental conditions or other vulnerabilities that make him susceptible to false confession. [¶] . . . But the fact of the matter is we have more than just the two confessions, we have an admission that he made to a 10 year old [*sic*]—one of the alleged confessions, and it's a little hard to argue he was entrapped or psychologically worn down by a 15 year old. She is not an authority figure. And certainly she was perhaps coached by law enforcement before she made the pretext call, but this is a case where I'm not particularly concerned about a false confession, given the evidence that's been admitted. [¶] Two victims who happen to be related, they disclosed at different times to different people. We have a pretext call where he's making a number of damning admissions. So this is not a case where we are simply left with a confession by a defendant and nothing else.

". . . I'm limiting the Defense to the hour that they promised the Court it would take to present this evidence. [¶] And I would ask that [the

---

violate the defendant's right to present a complete defense. (*Id*. at pp. 185–186.)

26

prosecutor] . . . take the same amount of time to cross-examine, if you need it. I will not permit the doctor to testify as to the results of the GSS exam under [Evidence Code section] 352 . . . ."

2. Standard of Review

" 'When expert opinion is offered, much must be left to the trial court's discretion.' " [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

Trial courts also have "broad discretion to exclude relevant evidence under Evidence Code section 352 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citations.] Such 'discretion extends to the admission or exclusion of expert testimony.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1181 (*Linton*).) We review evidentiary rulings under Evidence Code section 352 for abuse of discretion. (*Ibid*.) The trial court's discretion to exclude evidence is not unfettered. "An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. . . ." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

3. Analysis

Defendant argues Winkel's defendant-specific testimony was highly probative to the defense theory that defendant's admissions were false and that he only agreed that he committed the offenses because he is highly

suggestible and susceptible to giving a false confession. Defendant contends the trial court abused its discretion in excluding Winkel's testimony under Evidence Code section 352 because there was no counterbalancing risk of confusion or undue consumption of time given that Winkel would be testifying about false confessions and the issue of suggestibility in general.[20] The Attorney General responds that the trial court acted within it discretion because the excluded testimony was "not particularly probative where there was [1] no evidence that Detective Hurtado engaged in coercive conduct and [2] no evidence that [defendant]'s confessions were in fact false."

Initially, we observe there is no dispute here about whether a psychological expert's assessment of a criminal defendant's level of suggestibility and the results of psychological testing, including the results of a GSS test, could be admissible in the appropriate case. California courts have long permitted experts to rely "on 'standardized' psychological tests." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1154, 1158 ["defense expert opinion on an impressive range of psychiatric diagnoses has been admitted . . . where the expert made known at trial that he relied, in part, on" standardized psychological tests].) And, in *Linton*, *supra*, for example, a defense expert was permitted to testify "regarding [the] defendant's particular personality traits that may have lowered his ability to withstand the pressures of interrogation and increased his suggestibility." (*Linton*, *supra*, 56 Cal.4th at p. 1183.)

---

[20] Defendant notes that the trial court limited Winkel's direct examination to one hour and asserts defense counsel would likely have been "amenable to fitting the [excluded] defendant-specific testimony within that hour."

Regarding the probative value of the excluded evidence, Winkel's proffered testimony was clearly relevant to whether defendant's statements to Detective Hurtado were reliable. (See *United States v. West* (7th Cir. 2015) 813 F.3d 619, 620–621, 624 [expert testimony regarding the defendant's GSS test results, "low IQ and mental illness and how these combined conditions might have influenced his responses to the officers' questions while in police custody" was "clearly relevant and admissible on the issue of the reliability of [the defendant's] confession"]; *United States v. Roark* (11th Cir. 1985) 753 F.2d 991, 994 [defendant-specific expert testimony from a psychiatrist that the defendant "was extremely susceptible to suggestions and . . . could be 'suggested' into making up untrue stories" was "certainly relevant to the issue of what weight the jury should give [the defendant]'s incriminating statements"].) That Hurtado did not engage in coercive conduct does not diminish the relevance of Winkel's psychological assessment of defendant because the defense theory was not that law enforcement engaged in tactics that improperly coerced defendant into falsely confessing. Rather, it was that defendant's psychological makeup was such that he was, according to Winkel's written report, "easy to manipulate and . . . eager to avoid confrontations" and "highly susceptible to giving a false confession," even without coercion by the interrogator.[21] Nor can it reasonably be said that there was *no* evidence suggesting defendant may have falsely confessed. (Cf. *Linton, supra,* 56 Cal.4th at pp. 1179–1182 [no abuse of discretion to exclude proffered social psychologist's expert testimony regarding interrogation techniques and false confessions where "[t]here was no other evidence offered that logically called into question the veracity of [the defendant's]

---

[21] Recall that Winkel testified a person might falsely confess "not because of the actions of the investigator, but because of something in them."

admissions"].) As defense counsel argued, defendant's cousin J. testified defendant never touched her inappropriately even though defendant told Hurtado that he molested her. And no illegal pornography was found on defendant's iPad even though he confessed to looking at "pornos and stuff" on his tablet.

Regarding potential counterbalancing factors for excluding relevant evidence under Evidence Code section 352, nothing in the record supports a determination that Winkel's relevant defendant-specific testimony would have wasted time or confused or misled the jury. (Cf. *United States v. Roark, supra,* 753 F.2d at p. 994 [defense expert's testimony about the defendant's suggestibility could not reasonably be excluded under the evidence rule permitting exclusion of probative evidence " 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence' "].) In this case, the trial court permitted Winkel to testify as an expert. As defendant points out, there is no reason to think defense counsel could not have elicited Winkel's opinion about defendant's susceptibility to falsely confess and the bases for his opinion within the hour allotted for his testimony. Explaining its rationale for excluding Winkel's testimony about defendant's particular susceptibility to falsely confess, the trial court stated that it "personally" deemed the confessions reliable and it was "not concerned about a false confession in this case." But, as the court acknowledged, the reliability of defendant's admissions was a question for the jury, not the court.[22]

---

[22] As the United States Supreme Court has observed, "[E]ntirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince *the jury* that the manner in which the

In short, given the probative value of Winkel's testimony to the defense and the lack of any countervailing reason to exclude the evidence, we conclude the trial court's ruling under Evidence Code section 352 to exclude the testimony was an abuse of discretion.

That said, we agree with the Attorney General that the error was harmless under the circumstances. This prosecution was not a close case. Doe 1 and Doe 2 testified about the abuse, and each victim had previously revealed the abuse to a close friend. Doe 1's friend testified that Doe 1 told her she would try to lock herself in her room to avoid defendant, and Doe 1's mother testified she found Doe 1 hiding in a closet when defendant visited the house. The first time Doe 2 revealed the abuse to an adult (the school principal), she identified her abuser as Uncle Alvin. There was no evidence that either victim had a motive to lie about being abused.

The jury listened to a recording of the pretext call in which defendant admitted to Doe 1 that he molested her. This call was made before defendant was arrested; yet, when Doe 1 said she wanted to tell her mother about "when, uh you were touching me and stuff," defendant appeared to know exactly what she was referring to from years past, and his immediate response was to ask her not to tell anyone. The jury heard defendant respond, "No, no, no, no, just don't, please—please don't."[23] Defendant

---

confession was obtained *casts doubt on its credibility*." (*Crane v. Kentucky* (1986) 476 U.S. 683, 689, italics added.)

[23] Even Winkel testified that false confessions generally are not elicited this quickly. Asked on redirect whether "[i]t can be as simple as someone saying to a defendant did you assault this person and they did not but they just say yes, they agree," Winkel responded, "It usually takes a little longer, there's a back and forth. I haven't seen, like, a—I have never seen, like, a one question confession, but that kind of exchange can lead to false

continued to beg Doe 1 not to tell her mother about the abuse "because they're going to call the police on me." When Doe 1 asked why he did it, defendant said, "I just can't help myself, I don't know why. I really regret this," and he explained his behavior by saying, "I just . . . kinda like . . . pretty much started to like you or something, I don't know why, kind of . . . uh . . . like a crush."

In his interrogation, defendant stated (without prompting from Deputy Sheriff Hurtado) that he first molested Doe 1 at his house and that he made her touch his penis three times, corroborating Doe 1's account that the first incident occurred at his house and that he made her touch his penis on three different occasions.

The jury heard from defense expert Winkel that false confessions occur even without coercive conduct by the interrogator and that low education level, being interrogated in a non-native language, being passive and compliant, and lacking experience with law enforcement are all variables that can cause a person to be more susceptible to falsely confessing. The defense presented evidence showing defendant had only a high school education, he mainly spoke Tagalog and always lived with his parents, he was "easy to convince about silly things," he had no prior history interacting with the police, and he was especially docile and compliant during the police interviews. The jury listened to a recording of the discussion between Hurtado and defendant on the car ride from San Francisco to Napa and saw a video of the interrogation that occurred at the Sheriff's Department. There was no evidence that defendant recanted.

---

confession." And, of course, Winkel was referring to in-person police interrogations, not a telephone conversation between a 42-year-old man (who is not under arrest) and a 15-year-old girl.

32

On this record, we do not believe there is a reasonable probability that a result more favorable to defendant would have been reached had the jury also heard Winkel's testimony about defendant's GSS scores and his assessment that defendant was highly susceptible to giving a false confession in a police interrogation because Winkel's testimony would not have explained defendant's admissions to Doe 1 in the pretext call. (See *People v. Garcia* (2018) 28 Cal.App.5th 961, 970–971 [applying *Watson* standard to claimed state law error in excluding expert testimony].) According to his report, Winkel's expert assessment of defendant was that he was "highly susceptible to giving a false confession under the stress of a police interrogation." But defendant points to nothing in the record suggesting Winkel would have testified defendant was susceptible to making false statements in a telephone conversation with his 15-year-old niece.

We also reject defendant's claim that the exclusion of part of Winkel's proffered testimony violated his right to present a defense. "Although a defendant has the general right to offer a defense through the testimony of his or her witnesses, 'a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon this right.' " (*Linton*, *supra*, 56 Cal.4th at p. 1183.) The trial court's ruling "did not result in the blanket exclusion of evidence concerning the circumstances of defendant's admissions and confession." (*Ibid*.) As we have recounted, defense expert Winkel was allowed to testify on false confessions, the defense was allowed to elicit testimony on defendant's traits and circumstances that may have rendered him vulnerable to giving a false confession, the jury viewed the video of defendant's interview at the Sheriff's Department and listened to recordings of his other statements of admission, and defense counsel strenuously argued defendant was

susceptible to giving a false confession. Defendant was not denied the right to present a defense. (See *id.* at pp. 1183–1184 [rejecting claim of violation of the right to present a defense based on the exclusion of expert testimony regarding false confessions where the jury listened to tape recordings of the defendant's interviews, heard the testimony of detectives and a psychologist regarding the circumstances of the interviews, and heard expert testimony regarding the defendant's particular personality traits, and defense counsel "was able to and did strenuously argue this evidence established his admissions and confession were false"].)

C.    *Defense Counsel's Failure to Object to a Question Posed to K.*

Defendant argues he received ineffective assistance when defense counsel did not object to certain prosecutor questioning of the mother of one of the victims, which led to a "particularly dramatic emotional outburst" by the witness in front of the jury. We disagree.

1.    Background

In the direct examination of Doe 1's mother K., the prosecutor asked, "What are your feelings as you sit here now about the defendant, about Mr. Caparaz?" K. answered, "How could you? How dare you." The prosecutor said, "You're upset?" K. responded, "Upset? I'm mad. I'm hurt. What did you do to my kid and my family, you broke us up. There's no better evil, no evil, what you did. It haunts me every time I close my fucking eyes." At this point, the trial court said, "Okay. We can stop there. [¶] Ask another question."

The prosecutor had no further questions, and defense counsel asked for a break. The trial court ordered a recess and stated, "I'm sorry. Everyone, it's been a hard morning. If we could—I'm sorry. If we could just take a break at this point and maybe we can escort her out."

34

Defense counsel, outside the presence of the jury, then moved for a mistrial based on K.'s outburst, which he described as "completely inappropriate and quite out of control."[24] He stated the witness "was going on a rant and she had to literally be carried out in front of the jury; the jury had to be removed while she was still sitting here with [her] head down on top of the table, heaving and sobbing, unable to regain her composure."

The trial court stated, "it was quite emotional, it was quite a scene, I would concede that for the record." But, the court noted, defense counsel did not object to the question. The court advised defense counsel, "you have to be on top of the objections; you really do, when these questions are asked." The court also cautioned the prosecutor that this was an emotional case.

The prosecutor argued her question about K.'s current feelings about defendant was appropriate because the defense on cross-examination was going to question her motives and suggest she was biased. The prosecutor stated that she had cautioned the witnesses "not to have this kind of outburst on the stand" and she had not intended to elicit an outburst. She further observed, "I think the reason [defense counsel] probably didn't object is because it's not an improper question. It does go to the bias, motive, credibility, all of those things. So I was not anticipating that and that's not what I was trying to elicit."

Defense counsel defended his conduct in not objecting to the prosecutor's question, explaining, "[K.] had answered several questions, which was the reason why I hadn't objected, about her feelings about the case. She answered several questions about her feelings about Alvin and she maintained her composure."

---

[24] The trial court denied the motion for a mistrial, and defendant does not challenge the ruling on appeal.

2. <u>Analysis</u>

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

"It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 689; see *In re Valdez* (2010) 49 Cal.4th 715, 729–730 [quoting *Strickland*].)

In this case, considering defense counsel's perspective at the time the prosecutor posed her question (rather than with the benefit of hindsight), we conclude counsel's conduct fell within the wide range of reasonable professional assistance. "An attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540; *People v. Caro* (2019) 7 Cal.5th 463, 514.) Here, defense counsel offered his reason for not objecting to the prosecutor's question. He explained he had observed K. testify previously, including "several questions about her feelings about [defendant] and she maintained her composure." Thus, defense counsel deemed it unnecessary to object to the prosecutor's question about how she felt about defendant because he did not believe the answer risked prejudicing his client. Perhaps he also believed objecting risked antagonizing the jury or would call unnecessary attention to the question. Or defense counsel may have thought, as the prosecutor suggested, that the question was relevant given the defense theory that K. and D. were biased against defendant in that they wanted to blame him for abuse that might have been committed by their own brother.

In short, we cannot say this is the rare case where the failure to object amounted to ineffective assistance of counsel.

D. *Cumulative Prejudice*

We have concluded that excluding part of defense expert Winkel's testimony was harmless, and we have found that defense counsel did not provide ineffective assistance in not objecting to a question posed to K. Since we have found only one error, there is no cumulative error, and defendant's claim of cumulative prejudice also fails.

37

E.     *Sentencing Issues*

The trial court sentenced defendant to 25 years to life for count 1 (forcible lewd act upon a child), 25 years to life for count 2 (same), 15 years to life for count 3 (aggravated sexual assault of a child), 25 years to life for count 4 (sexual penetration of a child), 15 years to life for count 5 (lewd act upon a child), and 25 years to life for count 6 (same).  The court stayed the term for count 3 pursuant to section 654[25] and ordered the term for count 6 to run concurrent with count 1.  The remaining terms were to be served consecutively for a total sentence of 90 years to life in prison.  For counts 1, 2, 4, 5, and 6, defendant was sentenced under the One Strike law (§ 667.61, subds. (e)(4) and (j)(2)).

1.     Claim of Excessive Punishment

Defendant contends the sentence constitutes cruel and unusual punishment.  We are not persuaded.

"In general, fixing appropriate penalties for crimes is a distinctly legislative determination [citations], implicating sensitive questions of policy and values that 'are in the first instance for the judgment of the Legislature [or the people] alone.' [Citation.]  But the legislative power to craft punishments is subject to constraints rooted in both the state and federal Constitutions.  In limited circumstances, one or both provisions may relieve a defendant from a sentence that was otherwise lawfully imposed." (*In re Palmer* (2021) 10 Cal.5th 959, 967–968. (*Palmer*).)  "A claim of excessive punishment must overcome a 'considerable burden' [citation], and courts should give ' "the broadest discretion possible" ' [citation] to the legislative

_____

[25] The prosecutor had argued to the jury that counts 3 and 4 "represent just one specific incident" when Doe 1 was getting groceries out of the car and defendant put his fingers in her vagina.

judgment respecting appropriate punishment. [Citations.] A punishment does not qualify as constitutionally excessive unless it is ' "out of all proportion to the offense." ' " (*Id*. at p. 972.) "Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494 (*Martinez*).)

Review of a claim of excessive punishment involves "(1) an examination of the nature of the offense and the offender, with particular attention to the degree of danger both pose to society; (2) a comparison of the punishment with the punishment California imposes for more serious offenses; and (3) a comparison of the punishment with that prescribed in other jurisdictions for the same offense." (*Palmer*, *supra*, 10 Cal.5th at p. 973.)

a.      *Nature of the Offense and Offender*

" 'A look at the nature of the offense includes a look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of defendant's acts. A look at the nature of the offender includes an inquiry into whether "the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." ' " (*People v. Reyes* (2016) 246 Cal.App.4th 62, 87 (*Reyes*).) These considerations do not indicate grossly disproportionate punishment. Defendant was an adult in his late 30's when he repeatedly molested his girlfriend's young nieces (beginning when they were 11 and 7 years old) over a period of years. Defendant knew what he was doing was "not right," but he continued to victimize the girls. We agree with the Attorney General that the "sexual abuse of children plainly is a grave and serious crime and few crimes . . . are more despicable because of the life-long

consequences to the victims." (See *People v. Christensen* (2014) 229 Cal.App.4th 781, 806 [lewd conduct on a child "may have lifelong consequences to the well-being of the child"]; *People v. Baker* (2018) 20 Cal.App.5th 711, 724 (*Baker*) [" 'There exists a strong public policy to protect children of tender years' "].)

Defendant's reliance on *In re Rodriguez* (1975) 14 Cal.3d 639, superseded by statute as stated in *Palmer*, *supra*, 10 Cal.5th at p. 975, is misplaced. In *Rodriguez*, 22 years of imprisonment was found to be disproportionate where the petitioner's single incident of lewd conduct "caused no physical harm to the victim" and "lasted only a few minutes," the petitioner "was only 26 years old at the time of the offense," and his "conduct was explained in part by his limited intelligence, his frustrations brought on by intellectual and sexual inadequacy, and his inability to cope with these problems." (14 Cal.3d at pp. 653–655.) Defendant, in contrast, was much older when he molested his girlfriend's nieces, his offensives involved two victims and multiple incidents over the course of years, and there was no evidence that his crimes were attributable to cognitive deficits. The facts of this case are significantly more aggravated than those in *Rodriguez*. (See *Baker*, *supra*, 20 Cal.App.5th at pp. 715, 727 [15 years to life sentence for single count of oral copulation of six-year-old was not cruel or unusual; the nature of the offense was significantly more aggravated than the offense in *Rodriguez*].)

b. *Comparison with More Serious Offenses*

Defendant argues the One Strike law resulting in 15-year-to-life terms for the non-forcible lewd conduct against Doe 2 is disproportionate given that defendant would not be subjected to a One Strike term for "more serious" crimes such as assault with intent to commit rape, pimping or pandering for

40

prostitution, or sexual penetration or sodomy. Similar arguments have been rejected in *Baker*, *supra*, 20 Cal.App.5th at pages 727–729, and *Reyes*, *supra*, 246 Cal.App.4th at pages 88–89. " 'Punishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime. Leniency as to one charge does not transform a reasonable punishment into one that is cruel or unusual.' " (*Baker*, at p. 727.) "[T]he punishment under the One Strike law 'is precisely tailored to fit crimes bearing certain clearly defined characteristics.' " (*Reyes*, at p. 89 [upholding sentence of life without the possibility of parole for forcible oral copulation and forcible rape during the commission of a burglary under the One Strike law].) We do not believe this is one of the "rarest of cases" where the sentence mandated by statute is unconstitutionally excessive. (*Martinez*, *supra*, 76 Cal.App.4th at p. 494; see *Baker*, *supra*, 20 Cal.App.5th at p. 730 ["A comparison of the mandatory 15-year-to-life sentence under section 288.7, subdivision (b) to the punishments for similar and more serious sex offenses in California does not suggest this is that 'rarest of cases' in which 'the length of a sentence mandated by the Legislature is unconstitutionally excessive' "].)

> c.     *Comparison with Other Jurisdictions*

As the Attorney General notes, defendant makes no attempt to address the third prong of the excessive punishment analysis, which we take as a concession on this prong. (See *Reyes*, *supra,* 246 Cal.App.4th at p. 89 ["Because Reyes 'makes no effort to compare his sentence with . . . punishments in *other states* for the same offense' we take it 'as a concession that his sentence withstands [that] constitutional challenge' "].)

Finally, we reject defendant's claim that his sentence is excessive under the Eighth Amendment on the ground it "equates to a sentence of life without the possibility of parole." "The Eighth Amendment prohibits imposition of a

41

sentence that is 'grossly disproportionate' to the severity of the crime. [Citations.] In a noncapital case, however, successful proportionality challenges are 'exceedingly rare.' " (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1087 [citing cases].) Defendant offers no authority for his position that this is one of those exceedingly rare cases. (Cf. *Baker*, *supra*, 20 Cal.App.5th at p. 733 ["Baker cannot show that the sentence imposed on him, severe as it may be, violates the Eighth Amendment as applied to him"].)

  2. Assembly Bill No. 518

  At the time the trial court sentenced defendant (and during the period defendant was committing the offenses), section 654 provided that when an act or omission was "punishable in different ways by different provisions of law," the trial court was required to punish the defendant "under the provision that provide[d] for the longest potential term of imprisonment." (Former § 654, subd. (a), as amended by Stats.1997, ch. 410, § 1.) Effective January 1, 2022, however, Assembly Bill No. 518 (2021–2022 Reg. Sess.) (AB 518) amended section 654, subdivision (a), "to afford sentencing courts the discretion to punish the act or omission under either provision," without regard to the longest potential term of imprisonment. (*People v. Mani* (2022) 74 Cal.App.5th 343, 351 (*Mani*).)

  In this case, count 3, aggravated sexual assault of a child (§ 269, subd. (a)(5)), and count 4, sexual penetration of a child (§ 289, subd. (a)(1)(B)), were based on the same incident. (See fn. 25.) As we have described, the trial court sentenced defendant to 25 years to life in prison for count 4 under the One Strike law and imposed and stayed the 15-year-to-life term for count 3, pursuant to section 654. We asked the parties to be prepared to address at oral argument whether the matter should be remanded for resentencing in

light of AB 518's amendment to section 654, and we granted the parties leave to file supplemental briefing on the issue.

The Attorney General acknowledges that AB 518 applies retroactively to cases such as defendant's that are not final on appeal (*Mani*, *supra*, 74 Cal.App.5th at p. 379), but he posits that remand is not necessary here because the trial court is without discretion to stay punishment mandated by the One Strike law. The Attorney General relies on section 667.61, subdivision (h) (§ 667.61(h)), of the One Strike law, which provides, "*Notwithstanding any other law*, probation shall not be granted to, *nor shall the execution or imposition of sentence be suspended for*, a person who is subject to punishment under this section." (Italics added.)

When a defendant is convicted of two offenses for which section 654 prohibits multiple punishment (as is the case here), the trial court imposes sentence for one of them, and then imposes and stays the sentence for the other offense. (*Mani*, *supra*, 74 Cal.App.5th at p. 380.) A stay is a type of suspension. (See *People v. Santana* (1986) 182 Cal.App.3d 185, 190 ["A stay is a temporary suspension of a procedure in a case"].) The Attorney General argues section 667.61(h) means a trial court is prohibited from suspending or staying the imposition of a One Strike sentence notwithstanding any other law, including section 654.

Defendant argues section 667.61(h) means that a trial court is prohibited from granting probation for a One Strike offense and nothing more.[26] But this interpretation of section 667.61(h) renders the phrase "nor shall the execution or imposition of sentence be suspended for" meaningless, and "interpretations that render statutory terms meaningless as surplusage

---

[26] Defendant did not file supplemental briefing; appellate counsel stated his position at oral argument.

43

are to be avoided" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1010).

Defendant also points out that section 667.61(h) does not mention section 654 and does not expressly prohibit the "stay" of a sentence. The failure to identify section 654 is not dispositive; it is enough that the provision applies "[n]otwithstanding any other law." (See *In re Greg F.* (2012) 55 Cal.4th 393, 406 ["When the Legislature intends for a statute to prevail over all contrary law, it typically signals this intent by using phrases like 'notwithstanding any other law' or 'notwithstanding other provisions of law' "].) And, as we have explained, a stay is type of suspension; thus, a prohibition against suspending a sentence necessarily prohibits the stay of a sentence.

We agree with the Attorney General's reading of section 667.61(h) because it comports with the plain meaning of the provision and does not render the phrase "nor shall the execution or imposition of sentence be suspended for" surplusage. This reading also serves the purpose of the One Strike law, which is "to increase the penalties imposed on defendants who commit certain sexual offenses under specified circumstances." (*People v. Betts* (2020) 55 Cal.App.5th 294, 299.)[27]

Accordingly, we conclude the trial court in this case has no discretion to suspend or stay the One Strike sentence for count 4 in favor of the shorter

---

[27] Read as a whole, the One Strike law evinces the Legislature's intent to impose the greatest punishment possible for offenses covered by the law. Section 667.61, subdivision (f), for example provides that where "the minimum number of circumstances . . . that are required for the punishment provided in subdivision (a), (b), (j), (*l*), or (m) to apply have been pled and proved, that circumstance or those circumstances *shall be used* as the basis for imposing the term provided in subdivision (a), (b), (j), (*l*), or (m) *whichever is greater*, rather than being used to impose the punishment authorized under any other law, *unless another law provides for a greater penalty* or the punishment under another law can be imposed in addition to the punishment provided by this section." (Italics added.)

non-One Strike sentence for count 3 notwithstanding the amendment to section 654, and there is no need to remand for resentencing.

## DISPOSITION

The judgment is affirmed.

                _____

                Miller, J.


WE CONCUR:


_____

Richman, Acting P.J.


_____

Mayfield, J.[*]


A158473, *People v. Caparaz*

---

[*] Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Court:  Napa County Superior Court

Trial Judge:  Hon. Elia Ortiz

Victor Blumenkrantz under appointment by the Court of Appeal, for Defendant and Appellant

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Carlos A. Martinez, Jaime A. Scheidegger, Deputy Attorneys General, for Plaintiff and Respondent

A158473, *People v. Caparaz*